## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| VERONICA BANDY-FREEMAN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 2:22-cv-01148-NAD |
| | ) | |
| WAYMAN A. NEWTON, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER GRANTING
## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

For the reasons stated below, and on the record in the oral argument motion hearing, the court **GRANTS** the motion for summary judgment filed by Defendant Wayman A. Newton (Doc. 54).  On Plaintiff Veronica Bandy-Freeman's two constitutional claims under 42 U.S.C. § 1983, Defendant Newton is entitled to qualified immunity.  Plaintiff Bandy-Freeman cannot demonstrate a genuine dispute of material fact that Defendant Newton violated a clearly established constitutional right.  The court separately will enter final judgment.

## BACKGROUND

### A.    Factual background

The following are the material facts, as presented and construed by Bandy-Freeman, the nonmovant on this summary judgment motion (*see* Doc. 62):

On November 2, 2020, Bandy-Freeman was sworn in for her first term as an

1

elected City Councilwoman for the City of Tarrant, Alabama.  Doc. 62 at 5.

On the same date (November 2, 2020), Newton was sworn in as the Mayor of the City of Tarrant.  Doc. 62 at 5.

Both Newton and Bandy-Freeman are black.  Doc. 62 at 6.  Newton expected Bandy-Freeman and another black Councilwoman to "always vote with him on all issues," so that Newton "would then have three black votes against the three white votes of the other City Council Members."  Doc. 62 at 6.  One of the white Councilmembers was John Tommy Bryant.  Doc. 62 at 6.

"Several months after being elected," Bandy-Freeman "advised Newton that she would not vote with him on an issue as he directed."  Doc. 62 at 6.

Newton then "commenced racial, hateful, heinous, loathsome, discriminatory, and retaliatory attacks" on Bandy-Freeman.  Doc. 62 at 6.  After Bandy-Freeman "told Newton that she would no longer vote as he directed," Newton "screamed" at her on the telephone "on numerous occasions" and called her a "Stupid House N[*****]."  Doc. 62 at 6.

Newton called Bandy-Freeman "disparaging names or racial epithets or would otherwise insult her if she did not vote the way Newton wanted."  Doc. 62 at 6–7.

At the June 21, 2021 meeting of the Tarrant City Council, Newton again called Bandy-Freeman a "Stupid House N[*****]."  Doc. 62 at 7.

Newton continued to call Bandy-Freeman names and racial slurs when she

would not vote the way that he wanted.  Doc. 62 at 6–11.

Newton also sent text messages with images to Bandy-Freeman, "which reflected his ongoing campaign of racial discrimination against her."  Doc. 62 at 13–18.

Newton "regularly described" Bandy-Freeman "as illiterate," "told City employees" that she "was illiterate," and sent her text messages with images suggesting that she was illiterate.  Doc. 62 at 15–17.

Newton also "encouraged City employees to be non-responsive" to Bandy-Freeman," and "tried to turn employees" against Bandy-Freeman.  Doc. 62 at 27.  Newton contacted others to investigate Bandy-Freeman, including a City police officer, another City employee, and Bandy-Freeman's landlord.  Doc. 62 at 28.

In addition, the City of Tarrant has a Facebook page.  Doc. 62 at 20.

The City's Facebook page states:  "We are the official FB page for Tarrant, Alabama.  We want to keep folks informed about events and people affecting our community."  Doc. 62 at 21.  The Facebook page "is a place for Tarrant's citizens to be able to speak to matters of public interest and concern, as well as to comment on what is going on in Tarrant and even criticize the City" and Newton himself.  Doc. 62 at 20.

At one or more points in 2022–23, Newton "banned, blocked and removed" Bandy-Freeman from the City's Facebook page, including by blocking a profile

3

named "Vote Veronica Bandy-Freeman" from posting on the City's Facebook page. Doc. 62 at 21–26, 29–30.[1]  As a result, Newton blocked Bandy-Freeman's ability to post on the City's Facebook page.  Doc. 62 at 29.

### B.    Procedural background

On September 8, 2022, Bandy-Freeman initiated this action by filing a complaint against Defendants Newton, John Tommy Bryant, and the City of Tarrant. Doc. 1 at 1–2.  Pursuant to 42 U.S.C. § 1983, Bandy-Freeman alleged five claims for relief:  violation of the First Amendment against Newton (Count 1); violation of the Equal Protection Clause of the Fourteenth Amendment against Newton (Count 2), Bryant (Count 3), and the City (Count 4); and invasion of privacy against Newton (Count 5).  Doc. 1 at 7–18.

In October 2022, each Defendant moved to dismiss the complaint.  Doc. 9; Doc. 10; Doc. 14; *see* Doc. 15.  The parties fully briefed those motions to dismiss (Doc. 23; Doc. 24; Doc. 25; Doc. 26; Doc. 27; Doc. 28; *see* Doc. 20), and consented to magistrate judge jurisdiction (Doc. 19; 21 U.S.C. § 636(c); Fed. R. Civ. P. 73).

On January 31, 2023, the court held a motion hearing on the motions to dismiss.  *See* minute entry, entered: 01/31/2023; *see* Doc. 29; Doc. 30; Doc. 31 (scheduling).

---

[1] It is undisputed that, at all relevant times, Bandy-Freeman had more than one Facebook profile.  *See* Doc. 55-1 at 22.

On February 2, 2023, the court granted the motions to dismiss, with leave for Bandy-Freeman to amend.  Doc. 32.  The court ordered that two claims would proceed:  the First Amendment free speech claim against Newton (Count 1), and the Fourteenth Amendment equal protection claim against Newton (Count 2).  Doc. 32. The court dismissed for failure to state a claim the equal protection claims against Bryant (Count 3) and the City (Count 4), and the invasion of privacy claim against Newton (Count 5).  Doc. 32.

Bandy-Freeman then filed a notice stating that she would not file an amended complaint, and would proceed on Counts 1 and 2.  Doc. 33.  Accordingly, the court entered an order that the case would proceed only on Bandy-Freeman's claims against Newton for an alleged violation of the First Amendment right to free speech (Count 1), and for an alleged violation of the Fourteenth Amendment Equal Protection Clause (Count 2).  Doc. 34.

Count 1 of the complaint alleges that Newton violated Bandy-Freeman's First Amendment free speech right by blocking her ability to "participate in Facebook livestreams of the City Council and post on the City of Tarrant's Facebook page." Doc. 1 at 7–9.

Count 2 of the complaint alleges that Newton violated Bandy-Freeman's Fourteenth Amendment equal protection right by "using racial slurs to address" her after she did not "blindly support his agenda and vote consistently with his positions

and agenda because of her race." Doc. 1 at 9–11.

After the close of discovery, Newton filed this summary judgment motion. Doc. 54; *see* Doc. 55 (evidentiary materials); Doc. 56 (brief). Bandy-Freeman filed a response in opposition with evidentiary materials. Doc. 62; Doc. 63; *see* Doc. 64 (deposition transcript). Bandy-Freeman also filed a motion to supplement her evidentiary materials (Doc. 65), which the court granted (Doc. 70). Newton filed a reply (Doc. 66), and also supplemented his evidentiary materials (Doc. 68).

The court then held an oral argument motion hearing. *See* minute entry, entered: 04/16/2025; Doc. 67 (order setting hearing).

At the request of Bandy-Freeman's counsel during the oral argument, the court granted, but did not require, supplemental briefing "limited to the question whether the allegedly infringed rights were clearly established on the facts of this case—e.g., the First Amendment free speech right of a private citizen to post on the City's website, where the would-be poster was an elected official, and where the record contains no evidence that the would-be poster ever had posted on the City's website at all, either as an elected official or as a private citizen; and the Fourteenth Amendment right of an elected official to be free from racial coworker harassment in the governmental context." Doc. 69.

Both parties submitted supplemental briefs. Doc. 71 (Bandy-Freeman); Doc. 72 (Newton). And, on September 10, 2025, Bandy-Freeman again supplemented

her evidentiary materials (Doc. 73).

### C.     Legal background:  qualified immunity

"Under the doctrine of qualified immunity, 'government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'"  *Baker v. City of Madison, Ala.*, 67 F.4th 1268, 1278 (11th Cir. 2023) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).  Qualified immunity is "immunity from suit rather than a mere defense to liability," so a finding of qualified immunity results in judgment in favor of the defendant.  *Fleming v. United States*, 127 F.4th 837, 844 (11th Cir. 2025) (quoting *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985)).

"To invoke the defense of qualified immunity, a government official must have been acting within the scope of his discretionary authority when the allegedly wrongful acts occurred."  *Spencer v. Benison*, 5 F.4th 1222, 1230 (11th Cir. 2021) (quotation marks omitted).  "After a government official establishes that he was acting within the scope of his discretionary authority, the burden shifts to the plaintiff" to establish that qualified immunity does not apply.  *Id.*

To overcome qualified immunity, a plaintiff must "show[] (1) that the official violated a statutory or constitutional right, and (2) that the right was clearly established at the time of the challenged conduct."  *Echols v. Lawton*, 913 F.3d 1313,

1319 (11th Cir. 2019) (cleaned up). A plaintiff must show both elements to overcome qualified immunity, and a court can "analyze these two elements in whatever order is most appropriate for the case." *Baker*, 67 F.4th at 1278.

A plaintiff can demonstrate that a right was clearly established in three ways: (1) by identifying a "materially similar case" that previously has been decided; (2) by identifying a "a broader, clearly established principle that should control the novel facts of the situation"; or (3) by showing that the relevant conduct so obviously violated the Constitution as to render prior case law unnecessary. *Echols*, 913 F.3d at 1324 (quotation marks omitted). To overcome qualified immunity, a plaintiff does not need a case "directly on point," but there must be existing precedent that has "placed the constitutional question beyond debate." *Id.* (cleaned up). In determining whether a right was clearly established, courts "look only to binding precedent at the time of the challenged conduct—that is, the decisions of the Supreme Court, the Eleventh Circuit, or the highest court of the state." *Id.* (citation omitted).

A government official's conduct violates a clearly established right when "the contours of the right are sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Echols*, 913 F.3d at 1323 (cleaned up). A court must consider the relevant conduct in "the specific context of the case," rather than as a "broad general proposition." *Id.* at 1323–24 (cleaned up). The question is whether "the state of law at the time" gave "fair warning to every

reasonable official that the conduct clearly violates the Constitution." *Id.* at 1324 (citation and quotation marks omitted). The Supreme Court "has long ruled that qualified immunity protects a badly behaving official unless he had fair notice that his conduct would violate the Constitution." *Id.* at 1325 (collecting cases).

Moreover, in analyzing qualified immunity, a court focuses not only on the state of the law, but on the factual information that the defendant possessed at the time of the alleged violation. *See, e.g.*, *Anderson v. Creighton*, 483 U.S. 635, 641 (1987) (stating that the qualified immunity analysis "will often require examination of the information possessed by" the defendant official).

## LEGAL STANDARD

Summary judgment is appropriate when the movant establishes that "there is no genuine dispute as to any material fact," and that the movant "is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). A material fact is one that might affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).[2] And a dispute

---

[2] *Accord, e.g.*, *Celotex*, 477 U.S. at 322–23 ("[T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial.").

about a material fact is "genuine," if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

To avoid summary judgment, the nonmovant must go beyond the allegations to offer specific facts creating a genuine dispute for trial. *Celotex*, 477 U.S. at 324–25. The court's responsibility is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby*, 477 U.S. at 249. The court must construe all evidence and draw all reasonable inferences in favor of the nonmovant. *Centurion Air Cargo, Inc. v. UPS Co.*, 420 F.3d 1146, 1149 (11th Cir. 2005).

Where there is no genuine dispute of material fact for trial, the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a), (c).

## DISCUSSION

Newton is entitled to qualified immunity on Bandy-Freeman's First Amendment free speech claim and Fourteenth Amendment equal protection claim. Construing the record evidence and all reasonable inferences in Bandy-Freeman's favor, Bandy-Freeman cannot demonstrate a genuine dispute of material fact that Newton violated a clearly established constitutional right.

**I.    On Bandy-Freeman's First Amendment free speech claim (Count 1), there is no genuine dispute of material fact for trial because Newton is entitled to qualified immunity.**

Newton is entitled to qualified immunity and judgment as a matter of law on

Bandy-Freeman's First Amendment free speech claim (Count 1). On the record evidence, Bandy-Freeman cannot show that Newton violated a clearly established First Amendment free speech right by blocking Bandy-Freeman's ability to post on the City's Facebook page. *See* Doc. 62 at 31–35; *Baker*, 67 F.4th at 1278.

As a threshold matter, Bandy-Freeman acknowledges that the record evidence shows that Newton was acting within the scope of his discretionary authority for qualified immunity purposes. Doc. 62 at 35 ("Bandy-Freeman agrees that, as Tarrant's mayor, Newton's authority included administration of the City's Facebook page."); *see Spencer*, 5 F.4th at 1230. Consequently, the burden shifts to Bandy-Freeman to show that qualified immunity does not apply. *See Spencer*, 5 F.4th at 1230.

This court can "analyze the[] two [qualified immunity] elements in whatever order is most appropriate for the case." *Baker*, 67 F.4th at 1278. Here, regardless whether Newton may have violated Bandy-Freeman's First Amendment free speech right (whatever the scope of that right may be in the context of a city government's online social media page), any such right was not clearly established at the time of the alleged conduct (particularly given the factual information that Newton possessed at the time of the alleged conduct). *See, e.g.*, *id.*; *Anderson v. Creighton*, 483 U.S. at 641.

The court's analysis proceeds from the caselaw on the scope of the First

Amendment right to free speech as applied to online speech, to the First Amendment caselaw that differentiates private speech (protected) from government speech (not protected), to the fact that the relevant, alleged forum was the City's Facebook page, the fact that Bandy-Freeman was an elected City Councilwoman for the City of Tarrant, and the fact that Bandy-Freeman never had posted on the City's Facebook page at all before the alleged time of being blocked—either as an elected government official or as a private citizen.

### A. The scope of the First Amendment right to free speech as applied to online speech continues to develop

Given that Bandy-Freeman alleges Newton violated her First Amendment free speech right by blocking Bandy-Freeman's ability to post on the City's Facebook page, the court necessarily must begin its analysis of whether that right was clearly established on the facts of this case by recognizing that the Supreme Court and Eleventh Circuit caselaw continues to develop the scope of the First Amendment free speech right as applied to online speech. This is not a law review article, and a comprehensive discussion of that continuing development is not for this order.

For now, two admonitions suffice—one from Justice Thomas, and the other from the Eleventh Circuit.

Justice Thomas wrote a concurring opinion when the Supreme Court vacated a Second Circuit decision about First Amendment free speech on Twitter: After "Donald Trump, then President of the United States, blocked several users from

interacting with his Twitter account," the Second Circuit "held that the comment threads were a 'public forum' and that then-President Trump violated the First Amendment by using his control of the Twitter account to block the plaintiffs from accessing the comment threads." *Biden v. Knight First Amend. Inst. at Columbia Univ.*, 141 S. Ct. 1220, 1221 (2021) (Thomas, J., concurring) (citing *Knight First Amend. Inst. at Columbia Univ. v. Trump*, 928 F.3d 226 (2d Cir. 2019)). "Because of the change in Presidential administration," the Supreme Court vacated the Second Circuit's decision. *See id.*

In relevant part, Justice Thomas wrote separately to "highlight[] the principal legal difficulty that surrounds digital platforms—namely, that applying old doctrines to new digital platforms is rarely straightforward." *Biden*, 141 S. Ct. at 1221 (Thomas, J., concurring).

Recognizing that the First Amendment analysis as applied to online speech is "rarely straightforward" (*see id.*), this court also is mindful of the Eleventh Circuit's more general instruction about qualified immunity in the First Amendment context: It is "particularly difficult to overcome the qualified immunity defense in the First Amendment context." *Gaines v. Wardynski*, 871 F.3d 1203, 1210 (11th Cir. 2017).

Nonetheless, the Supreme Court has held that the "First Amendment's Free Speech Clause, applicable to the States under the Due Process Clause of the Fourteenth Amendment" does reach online "websites, including commonplace

13

social media websites like Facebook and Twitter." *Packingham v. North Carolina*, 582 U.S. 98, 101 (2017) ("[T]o foreclose access to social media altogether is to prevent the user from engaging in the legitimate exercise of First Amendment rights.").

So, with those admonitions in mind, the court proceeds.

### B.    Private speech (protected) versus government speech (not protected)

Generally speaking, the First Amendment protects private speech, but not government speech.

In this regard, Bandy-Freeman does not assert a First Amendment claim based any of the legislative votes that she has cast. Nor could she, as the Supreme Court has held that casting a legislative vote does not qualify as protected speech under the First Amendment. *See Nevada Comm'n on Ethics v. Carrigan*, 564 U.S. 117, 121 (2011).

Instead, Bandy-Freeman argues that Newton violated her First Amendment free speech right by blocking her ability to post on the City's Facebook page. Bandy-Freeman argues that Newton's conduct constituted viewpoint (and/or content-based and/or speaker-based) discrimination that violated the First Amendment. Doc. 62 at 31–34.

In the "realm of private speech or expression, government regulation may not favor one speaker over another," and "[d]iscrimination against speech because of its

message is presumed to be unconstitutional." *Rosenberger v. Rector & Visitors of Univ. of Virginia*, 515 U.S. 819, 828 (1995).  It is "axiomatic that the government may not regulate speech based on its substantive content or the message it conveys." *Id.*  Viewpoint discrimination is "an egregious form of content discrimination" under the First Amendment, and the government generally "must abstain from regulating speech when the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction." *Id.* at 829.

But the "Free Speech Clause restricts government regulation of private speech; it does not regulate government speech." *Pleasant Grove City v. Summum*, 555 U.S. 460, 467 (2009).  The "Free Speech Clause of the First Amendment works as a shield to protect private persons from encroachments by the government on their right to speak freely," not "as a sword to compel the government to speak for them." *Cambridge Christian Sch., Inc. v. Florida High Sch. Athletic Assn., Inc.*, 115 F.4th 1266, 1288 (11th Cir. 2024), *petition for cert. filed*, (U.S. June 10, 2025) (No. 24-1261) (cleaned up).

So, "[w]hen government speaks, it is not barred by the Free Speech Clause from determining the content of what it says." *Gundy v. City of Jacksonville Fla.*, 50 F.4th 60, 71 (11th Cir. 2022) (quoting *Walker v. Texas Div., Sons of Confederate Veterans, Inc.*, 576 U.S. 200, 207 (2015)).

Because "government statements (and government actions and programs that

15

take the form of speech) do not normally trigger the First Amendment rules designed to protect the marketplace of ideas," when the government engages in government speech "it can freely select the views that it wants to express, including choosing not to speak and speaking through the removal of speech that the government disapproves." *Gundy*, 50 F.4th at 71 (cleaned up); *see also Pickering v. Board of Education*, 391 U.S. 563, 568 (1968) ("[T]he State has interests as an employer in regulating the speech of its employees that differ significantly from those it possesses in connection with regulation of the speech of the citizenry in general.").

This "does not mean that there are no restraints on government speech. . . . A government entity is ultimately accountable to the electorate and the political process for its advocacy. If the citizenry objects, newly elected officials later could espouse some different or contrary position." *Gundy*, 50 F.4th at 71 (cleaned up; citations omitted).

To state the obvious (as the Eleventh Circuit did recently in a published opinion), "[t]he government can speak directly through its own members." *Nussbaumer v. Secretary, Fla. Dep't of Child. & Fams.*, No. 24-14082, 2025 WL 2538670, at *4 (11th Cir. Sept. 4, 2025). In other words, "[w]here the government speaks, 'the Free Speech Clause has no application.'" *Id.* (quoting *Pleasant Grove City*, 555 U.S. at 467).

Otherwise, the question "[w]hether speech is government speech is inevitably

a context specific inquiry." *Cambridge Christian*, 115 F.4th at 1288 (quotation marks omitted).

There is "no precise test for determining whether speech is government or private speech," but the Eleventh Circuit generally considers "three factors": "the history of the expression at issue; the public's likely perception as to who (the government or a private person) is speaking; and the extent to which the government has actively shaped or controlled the expression." *Cambridge Christian*, 115 F.4th at 1288 (cleaned up). The three factors—"history, endorsement, and control—are not exhaustive and may not all be relevant in every case." *Id.*

## C.    The relevant, alleged forum was the City's Facebook page

Perhaps acknowledging that any of her speech as an elected City Councilwoman on the City's Facebook page would categorically be unprotected government speech (or at least that any of her alleged speech would be subject to the context specific inquiry of whether it constitutes government speech), Bandy-Freeman argues that the City's Facebook page "is a public forum," and that Newton violated her First Amendment free speech right to speak—as a private "citizen"—on the City's Facebook page. *See, e.g.*, Doc. 62 at 29–34.

On this point, the court cannot ignore the Eleventh Circuit's per curiam decision from July 2023 in *Taylor v. Palmer*, even though it is unpublished. No. 21-14070, 2023 WL 4399992 (11th Cir. July 7, 2023) (unpublished). Just like this case,

17

*Taylor* examined a mayor's qualified immunity defense on summary judgment against a First Amendment free speech claim after the mayor had blocked a specific profile from posting on the city's Facebook page.  2023 WL 4399992, at *1.

But in *Taylor* it was undisputed that the would-be poster was a private citizen:  "The mayor of Adamsville, Alabama, blocked a frequent critic from posting comments on the city's Facebook page for about a week in 2016."  *Taylor*, 2023 WL 4399992, at *1.  The private-citizen critic in *Taylor* "was the city's most outspoken critic."  *Id.*  The private-citizen critic "sued the mayor for damages, asserting the block violated the critic's First Amendment right to freedom of speech," and the mayor "moved for summary judgment based in relevant part on qualified immunity." *Id.*

After the district court had denied the mayor's summary judgment motion based on qualified immunity, the Eleventh Circuit reversed, concluding that it was not clearly established that the mayor's blocking the private-citizen critic from posting on the city's Facebook page violated the First Amendment.  *Taylor*, 2023 WL 4399992, at *1.

The Eleventh Circuit addressed two of the "principles" discussed above—i.e., (1) the "general First Amendment principle disfavoring government viewpoint-based restrictions on speech," and (2) the principle that "the government's own speech . . . is not subject to the same constraints as the government's restriction of

private speech." *See Taylor*, 2023 WL 4399992, at *3.

According to the Eleventh Circuit, "How these two principles apply to a government's social-media account—for example, its Facebook page—was not clear in December 2016 and [wa]s not clear [in July 2023]." *Taylor*, 2023 WL 4399992, at *3.

The Eleventh Circuit reasoned that, "[o]n one view, a government page that allows members of the public to post comments is a limited public forum," but, "on another view, a government page is government speech, even when others do some of the speaking." *Taylor*, 2023 WL 4399992, at *3 (citations omitted).

The Eleventh Circuit then concluded that, "[w]hen the mayor blocked [the private-citizen critic] in December 2016, it was not clearly established whether a Facebook page of this kind was a limited public forum, governed by the first principle noted above, or instead constituted government speech, governed by the second," and that—for qualified immunity purposes—"[w]hat matters here is not how this issue would be resolved on the merits but only that the law was not clearly established." *Taylor*, 2023 WL 4399992, at *3.

Thus, assuming that the Eleventh Circuit were to agree in a published opinion with the per curiam panel's decision in the unpublished *Taylor* decision, even a private citizen's First Amendment right to be free from a mayor's blocking the citizen from posting on the city's Facebook page was not clearly established as of

July 2023.  *Taylor*, 2023 WL 4399992, at *3 (law "was not clear in December 2016 and is not clear today").

Here (practically speaking), the law may be that any speech on the City of Tarrant's Facebook page, even posts from private citizens, is unprotected government speech because "a government['s] [Facebook] page [may be] government speech, even when others do some of the speaking," and because "the government can make even viewpoint-based decisions on what to say or not to say," "[w]hen a government chooses to speak . . . the government may say what it wishes and may enlist speakers of its choice," and "[j]ust because the government enlists speakers does not mean it must turn over the microphone to all others who wish to speak."  *Taylor*, 2023 WL 4399992, at *3 (citations omitted).

The point for now is that the First Amendment free speech right—of even private citizens—to post on the City of Tarrant's Facebook page was not clearly established "at the time of the challenged conduct."  *See Echols*, 913 F.3d at 1319 (cleaned up); *Taylor*, 2023 WL 4399992, at *3.

Moreover, like *Taylor*, both *Knight* and *Lindke*,[3] two cases on which Bandy-Freeman relies here, analyzed whether a social media page constituted a public forum where free speech was protected under the First Amendment.  But neither of those cases could make any alleged First Amendment free speech right clearly

---

[3] *Lindke v. Freed*, 601 U.S. 187 (2024).

established on the record facts here.  Neither case could clearly establish that the City of Tarrant's Facebook page was a public forum—and not government speech that the First Amendment did not reach—at the time of the challenged conduct.  And, unlike Bandy-Freeman's claim here, neither case dealt with the alleged First Amendment free speech right of an elected government official who had been blocked from posting on the government's own social media page.

With respect to *Knight* (as an initial matter), the Supreme Court vacated the Second Circuit's decision—the vacatur as to which Justice Thomas concurred, *see supra* Part I.A.  *Biden*, 141 S. Ct. 1220 (Thomas, J., concurring).

In its now vacated decision, the Second Circuit examined whether President Trump had "acted in a governmental capacity or as a private citizen," when blocking private citizens from his Twitter profile, and whether, to the extent that President Trump's Twitter profile "[wa]s controlled by the government, it [wa]s government speech"; qualified immunity was not at issue.  *See Knight First Amend. Inst.*, 928 F.3d at 234–35, 239.  The record in *Knight* showed that, "[i]n May and June of 2017, the President blocked each of the Individual Plaintiffs" (i.e., private citizens) from his Twitter profile, that "each of them was blocked after posting replies in which they criticized the President or his policies," and that "they were blocked as a result of their criticism."  *Id.* at 232.

In relevant part, the district court had reasoned that the "replies to the

President's tweets remain[ed] the private speech of the replying user." *Knight First Amend. Inst.*, 928 F.3d at 233 (citation and quotation marks omitted). The Second Circuit ruled that "the speech in question is that of multiple individuals, not just the President or that of the government," reasoning in relevant part that "the President's tweets can accurately be described as government speech," but that "the retweets, replies, and likes of other users in response to his tweets are not government speech under any formulation." *Id.* at 239.

Whatever the vacated decision in *Knight* may suggest about when a government official's social media page may constitute a public forum, that decision still could not make any First Amendment free speech right clearly established on the facts of this case. Unlike Bandy-Freeman here, none of the "Individual Plaintiffs" whom President Trump blocked from his Twitter profile was an elected government official.

In this case, because Bandy-Freeman was an elected City Councilwoman, the parties dispute whether any conceivable speech from Bandy-Freeman on the City's Facebook page would have—or even could have—constituted protected private speech, as opposed to unprotected government speech. *See, e.g.*, *Knight First Amend. Inst.*, 928 F.3d at 239 ("the President's tweets can accurately be described as government speech"); *see also* Doc. 56 at 15–16.

Likewise, in *Lindke*, qualified immunity was not at issue. The Supreme

Court's *Lindke* decision dealt with the First Amendment free speech right in the context of a city manager's Facebook page. 601 U.S. at 191–92. After a private citizen criticized the city manager on the city manager's Facebook page, the city manager "deleted [the private citizen's] comments; ultimately, he blocked him. Once blocked, [the private citizen] could see [the city manager's] posts but could no longer comment." *Id.* at 193. The private citizen sued the city manager under 42 U.S.C. § 1983, alleging that the city manager had violated his First Amendment free speech right. *Id.* According to private-citizen plaintiff, "he had the right to comment on [the city manager's] Facebook page, which he characterized as a public forum," and the city manager "had engaged in impermissible viewpoint discrimination by deleting unfavorable comments and blocking the people who made them." *Id.*

The Supreme Court reasoned that, "[b]ecause only state action can give rise to liability under § 1983," the private citizen's claim depended on whether the city manager "acted in a 'private' or 'public' capacity" in administering the city manager's Facebook page. *Lindke*, 601 U.S. at 193 (citation omitted). The Supreme Court reasoned further that, "[w]hen a government official posts about job-related topics on social media, it can be difficult to tell whether the speech is official or private." *Id.* at 191. The Supreme Court then held that for purposes of state action under § 1983 "such speech is attributable to the State only if the official (1) possessed actual authority to speak on the State's behalf, and (2) purported to exercise that

authority when he spoke on social media." *Id.*

Again, whatever *Lindke* may suggest about when a government official's social media page may constitute a public forum (or, more fundamentally, state action for § 1983 purposes), the Supreme Court's decision still could not make any First Amendment free speech right clearly established on the facts of this case. Unlike Bandy-Freeman, the private-citizen plaintiff in *Lindke* was not an elected government official.

> **D.    Bandy-Freeman was an elected City Councilwoman for the City of Tarrant, and never had posted on the City's Facebook page at all—either as an elected government official or as a private citizen**

As noted above, Bandy-Freeman argues that Newton violated her First Amendment free speech right to speak as a private citizen on the City's Facebook page. But it is undisputed that Bandy-Freeman was an elected City Councilwoman for the City of Tarrant, and never had posted on the City's Facebook page at all—either as an elected government official or as a private citizen.

The record includes no posts that Bandy-Freeman made on the City's Facebook page.

That may not be dispositive, but there is no evidence of any actual speech for the court (or a jury) to assess as conceivably private speech or government speech according to the Eleventh Circuit's "context specific inquiry," which typically involves at least "three factors" ("history, endorsement, and control").    *See*

*Cambridge Christian*, 115 F.4th at 1288 (cleaned up).

More importantly, there was no post for Newton conceivably to have assessed as private speech or government speech at the time of the challenged conduct. *See Echols*, 913 F.3d at 1319.

Instead, Bandy-Freeman relies on her deposition testimony as to the topics about which she hypothetically would have posted—as a private citizen—had she not been blocked from doing so on the City's Facebook page. Doc. 55-1 at 27–29. For example, according to Bandy-Freeman, she would have posted about the following: "[I]f I had the right to write on Facebook like I wanted to . . . not as a council person but just as a citizen, my concerns would be like why is the Mayor getting the city sued so much?  Why so many people that has been there getting fired?  Why is it that we can't -- about the ARPA money and the CARES money, what is it going to be used for?  I would like to know just as a citizen about ways to transparency and the lack of.  I would talk about the trash.  I go around and video my district.  It looks like a third world country.  I would talk about good government. I would talk about fair treatment for not just a certain amount -- certain group of people to come in and be able to get businesses and everybody else couldn't.  I would talk about . . . education . . . ."  Doc. 55-1 at 27.

As noted above (according to the Eleventh Circuit), "[t]he government can speak directly through its own members." *Nussbaumer*, 2025 WL 2538670, at *4

(published).  Practically speaking, all of the topics about which Bandy-Freeman hypothetically would have posted on the City's Facebook page sound like stuff about which an elected City Councilwoman would have been speaking.

Indeed, Bandy-Freeman's hypothetical post still would have been speech from an elected City Councilwoman, one of the City government's "own members" (*Nussbaumer*, 2025 WL 2538670, at *4), on the City's own Facebook page—and "a government page [may be] government speech, even when others do some of the speaking" (*Taylor*, 2023 WL 4399992, at *3).

As a result, even this hypothetical speech may have constituted unprotected government speech anyway.

Regardless (again), the more important point for now is that Newton could not have known about what Bandy-Freeman hypothetically might have posted at the time of the challenged conduct.  *See, e.g.*, *Anderson v. Creighton*, 483 U.S. at 641 (qualified immunity analysis "will often require examination of the information possessed by" the defendant official).  Bandy-Freeman never had posted on the City's Facebook page at all.  And Newton could not have assessed this hypothetical speech as conceivably private speech or government speech according to the Eleventh Circuit's "context specific inquiry," which typically involves at least "three factors" ("history, endorsement, and control").  *See Cambridge Christian*, 115 F.4th at 1288 (cleaned up).

Stated otherwise, on the record evidence and in "the specific context of the case" (and given the uncertainty of the First Amendment caselaw at the time of the challenged conduct and today), Bandy-Freeman cannot show that "every reasonable official would have understood" that blocking her from posting on the City's Facebook page would violate her First Amendment free speech right to post as a private citizen—where Bandy-Freeman was an elected City Councilwoman, who never before had posted on the City's page. *See Echols*, 913 F.3d at 1323–24 (cleaned up).

For qualified immunity purposes, Newton could not have "had fair notice that his conduct would violate the Constitution" (*Echols*, 913 F.3d at 1325 (collecting cases)), because there is no "materially similar case" and no "broader, clearly established principle that should control the novel facts of the situation," and because Bandy-Freeman cannot otherwise show that Newton so obviously violated the Constitution as to render prior case law unnecessary (*id.* at 1324 (quotation marks omitted)).  Thus, on the record evidence, Bandy-Freeman cannot show that Newton violated a clearly established First Amendment free speech right by blocking Bandy-Freeman's ability to post on the City's Facebook page.

## II.  On Bandy-Freeman's Fourteenth Amendment equal protection claim (Count 2), there is no genuine dispute of material fact for trial because Newton is entitled to qualified immunity.

Newton is entitled to qualified immunity and judgment as a matter of law on

Bandy-Freeman's Fourteenth Amendment equal protection claim (Count 2). On the record evidence, Bandy-Freeman cannot show that Newton violated a clearly established Fourteenth Amendment equal protection right by using racial slurs and otherwise harassing her. *See* Doc. 62 at 39–43; *Baker*, 67 F.4th at 1278.

Bandy-Freeman and Newton both were elected government officials. This was not an employment situation, and Newton was not Bandy-Freeman's supervisor. So far as this court can tell—in the more than 150 years since the Fourteenth Amendment was adopted in 1868—no court ever has recognized a Fourteenth Amendment equal protection right of an elected official to be free from racial harassment (from another elected official) in the governmental context. Even if this court were inclined to be the first to recognize any such right (and to do so on the record facts here), that right still necessarily could not have been clearly established in this "specific context" at the "time of the challenged conduct." *See Echols*, 913 F.3d at 1319, 1323–24 (cleaned up).

Bandy-Freeman argues that—after she did not vote the way that Newton wanted—Newton discriminated against her in violation of the Equal Protection Clause of the Fourteenth Amendment by subjecting her to racial harassment, including by calling her a "Stupid House N[*****]" and sending her text messages with racially discriminatory images. Doc. 62 at 39–40; *see* Doc. 1 at 9–11. Bandy-Freeman argues that Newton "used racial epithets to identify her, sent her racially

28

charged text messages, attacked her intelligence, humiliated her, and verbally attacked her."  Doc. 62 at 42.

Unlike her First Amendment claim, Bandy-Freeman appears to dispute that the record evidence shows that Newton was acting within the scope of his discretionary authority for qualified immunity purposes when he allegedly discriminated against her.  Doc. 62 at 42.  To show that a defendant government official was acting within the scope of his discretionary authority such that qualified immunity may apply, the defendant official must show that he acted "(1) in accordance with [his] job-related duties, and (2) within the scope of [his] authority." *Huggins v. School Dist. of Manatee Cty.*, No. 22-13325, 2025 WL 2374371, at *4 (11th Cir. Aug. 15, 2025) (published).  "When considering this showing, the district court must look to the general nature of the defendant's action, temporarily disregarding the alleged illegality of that act." *Id.* (cleaned up).

In this regard, Bandy-Freeman does "agree[] that Newton was acting as Tarrant's mayor when he used racial epithets to identify her, sent her racially charged text messages, attacked her intelligence, humiliated her, and verbally attacked her." Doc. 62 at 42.  However, Bandy-Freeman "does not agree" that Newton "had the authority as mayor to use racial epithets to identify her, send her racially charged text messages, attack her intelligence, humiliate her, and/or verbally attack her." Doc. 62 at 42.

But, "look[ing] to the general nature" of Newton's conduct, and "temporarily disregarding the alleged illegality" of that conduct (*see Huggins*, 2025 WL 2374371, at *4), the undisputed evidence is that Newton (as the elected Mayor) was communicating with and acting against Bandy-Freeman (as an elected City Councilwoman) in response to—or retaliation for—Bandy-Freeman's not voting the way that Newton wanted. Accordingly, on the record evidence, Newton was acting within the scope of his discretionary authority for qualified immunity purposes,[4] and the burden shifts to Bandy-Freeman to show that qualified immunity does not apply. *See Spencer*, 5 F.4th at 1230.

Under the Equal Protection Clause of the Fourteenth Amendment, "No State shall . . . deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. With respect to racially discriminatory harassment, "[c]ourts have held that offensive or derogatory statements, even if racially tinged or racially motivated, do not violate equal protection guarantees unless they are so pervasive as to amount to racial harassment or are accompanied by some other conduct that deprives a person of the equal protection of the laws." *Watson v. Division of Child Support Servs.*, 560 F. App'x 911, 913 (11th Cir. 2014) (affirming

---

[4] Even assuming that Newton was acting outside the scope of his discretionary authority, and that qualified immunity consequently does not apply, there still is no caselaw recognizing a Fourteenth Amendment equal protection right of an elected official to be free from racial harassment—from another elected official—in the governmental context.

dismissal of complaint for failure to state a claim where pro se plaintiff alleged equal protection violation against state division of child support services and one of its case agents based on the case agent's alleged racially discriminatory statements).

Furthermore, there is precedent for a § 1983 equal protection claim based on an alleged hostile work environment in public employment. *See, e.g.*, *Cross v. State of Ala., State Dep't of Mental Health & Mental Retardation*, 49 F.3d 1490, 1507 (11th Cir. 1995) (recognizing "a constitutional right to be free from unlawful sex discrimination and sexual harassment in public employment"). In *Cross*—a "hostile environment sexual harassment lawsuit," 49 F.3d at 1494—the plaintiffs alleged a violation of their equal protection rights pursuant to § 1983, "based upon [their supervisor's] sexual harassment," *id.* at 1507. The plaintiffs were "past or present female employees" at a state mental health facility, and the relevant individual defendant was the director of the facility. *Id.* at 1494.

But (again), even assuming that the Equal Protection Clause conceivably could include a right of an elected official to be free from racial harassment (from another elected official) in the governmental context, that right still could not have been clearly established at the time of the challenged conduct.

Bandy-Freeman cites and quotes from *McMillan v. DeKalb County, Georgia*, 211 F. App'x 821 (11th Cir. 2006), for the proposition that "the 'right to be free from racial discrimination in the public workplace was a clearly established constitutional

right of which a reasonable official would have known.'" Doc. 62 at 42 (quoting *McMillan*, 211 F. App'x at 824).

Nevertheless, assuming that right as a "broad general proposition" (*Echols*, 913 F.3d at 1323–24 (cleaned up)), the individual defendant in *McMillan* was the plaintiff's supervisor in the public employment context. 211 F. App'x at 822. In *McMillan*, the individual defendant was the "Director of the Parks & Recreations Department [PRD]," and the plaintiff "was a 30-year veteran employee of the PRD when she was terminated" by the individual defendant. *Id.* The plaintiff alleged that the individual defendant "terminated her on the basis of her race, in violation of Title VII and § 1983." *Id.*

Here, there is no evidence that Newton was Bandy-Freeman's supervisor. The only evidence is that Newton and Bandy-Freeman were apparently coequal elected government officials, and apparently (eventually) political rivals. According to Bandy-Freeman, that is why Newton expected Bandy-Freeman and another black Councilwoman to "always vote with him on all issues"—so that Newton "would then have three black votes against the three white votes of the other City Council Members," Doc. 62 at 6—and that is why Newton reacted with discriminatory, harassing conduct when Bandy-Freeman did not vote the way that Newton wanted.

Bandy-Freeman cites other cases like *McMillan*, in which employee plaintiffs alleged equal protection claims against their supervisors based on race

discrimination in the public employment context. *See* Doc. 62 at 42–43; *Brown v. City of Fort Lauderdale*, 923 F.2d 1474, 1482 (11th Cir. 1991) ("[The plaintiff's] right to be free from a racially motivated discharge unquestionably was clearly established before his termination."); *Ham v. City of Atlanta*, No. 1:07-CV-309-BBM-RGV, 2009 WL 10668310, at *14 (N.D. Ga. July 22, 2009) ("The Eleventh Circuit has recognized a clearly established right to be free from race discrimination in public employment.  It is beyond doubt that there is a federal equal protection right to be free from racial discrimination, that this right is clearly established, and that it extends into the employment context." (collecting cases; cleaned up)).

In *Brown*, the pro se plaintiff was a city employee, who sued the police chief and the city manager under 42 U.S.C. §§ 1981 and 1983, alleging that "he was fired from his job as a police officer for the [city] because he is black."  923 F.2d at 1475. The defendant police chief allegedly had notified the plaintiff "by letter that he was being dismissed," and the defendant city manager, "the official who technically had the authority to hire and fire all city employees," had "confirmed [the plaintiff's] dismissal."  *Id.* at 1476.  And, in *Ham*, the plaintiffs were city employees, who filed "claims of race discrimination arising from their employment as firefighters," alleging that the former fire chief and the former chief operating officer for the city "implemented an unlawful racial balancing program governing the promotions of personnel to [the fire department's] discretionary positions," and that the plaintiffs

"ha[d] all been passed over for promotion because of their race in favor of less qualified, less experienced African-American candidates." 2009 WL 10668310, at *1.

Again, even if elected government officials are considered employees in the public employment context, there still is no evidence that Newton was Bandy-Freeman's supervisor.

In response to counsel's request, the court permitted supplemental briefing on the question whether "the Fourteenth Amendment right of an elected official to be free from racial coworker harassment in the governmental context" was "clearly established on the facts of this case." Doc. 69. The supplemental brief (Doc. 71) cites another case in which the employee plaintiffs alleged an equal protection claim against their supervisor based on race discrimination in the public employment context,[5] cases that did not involve public employment or did not involve an equal protection claim,[6] federal appellate cases from outside the Eleventh Circuit, a district

---

[5] *Bryant v. Jones*, 575 F.3d 1281, 1288–89 (11th Cir. 2009) (public employees alleged an equal protection claim against the county's chief executive officer and three subordinates who assisted him based on an alleged racially discriminatory hostile work environment where the county "embarked on a wholesale plan to replace its white county managers with African Americans," the defendant chief executive officer "devised the plan and monitored its execution," and the defendant chief executive officer and "his administration implemented an aggressive restructuring program of the county's government").

[6] *Cooler v. Layne Christensen Co.*, 710 F. App'x 842 (11th Cir. 2017) (private employee sued employer, alleging retaliation, race discrimination, and hostile work environment under 42 U.S.C § 1981 and Title VII); *Smelter v. Southern Home Care*

court case about discrimination in education (*Green v. Jacksonville State Univ.*, No. 1:16-CV-1047-VEH, 2017 WL 2443491 (N.D. Ala. June 6, 2017)), and the Supreme Court's decision in *Students for Fair Admissions, Inc. v. President & Fellows of Harvard College*, 600 U.S. 181, 190–91 (2023) ("In these cases we consider whether the admissions systems used by Harvard College and the University of North Carolina, two of the oldest institutions of higher learning in the United States, are lawful under the Equal Protection Clause of the Fourteenth Amendment.").

While Bandy-Freeman may not need a case "directly on point," there still must be existing precedent that has "placed the constitutional question beyond debate." *Echols*, 913 F.3d at 1324 (cleaned up).

There is none.

In "the specific context of the case" (rather than as a "broad general proposition"), Bandy-Freeman cannot show that "every reasonable official would have understood" that using racial slurs and otherwise harassing her would violate her Fourteenth Amendment equal protection right—where both Bandy-Freeman and Newton were elected government officials, and where Newton was not Bandy-

---

*Servs. Inc.*, 904 F.3d 1276 (11th Cir. 2018) (private employee sued employer, alleging discriminatory termination, hostile work environment, and retaliation under Title VII and 42 U.S.C. § 1981); *Slack v. Stream*, 988 So. 2d 516, 517 (Ala. 2008) (claims for defamation, invasion of privacy, and intentional interference with a business contract); *Belcher v. Jefferson Cty. Bd. of Educ.*, 474 So. 2d 1063 (Ala. 1985).

Freeman's supervisor in an employment situation. *See Echols*, 913 F.3d at 1323–24 (cleaned up).

Newton again could not have "had fair notice that his conduct would violate the Constitution" (*Echols*, 913 F.3d at 1325 (collecting cases)), because there is no "materially similar case" and no "broader, clearly established principle that should control the novel facts of the situation," and because Bandy-Freeman cannot otherwise show that Newton so obviously violated the Constitution as to render prior case law unnecessary[7] (*id.* at 1324 (quotation marks omitted)). Thus, on the record evidence, Bandy-Freeman cannot show that Newton violated a clearly established Fourteenth Amendment equal protection right by using racial slurs and otherwise harassing her.

## CONCLUSION

For the reasons stated above, Newton's summary judgment motion (Doc. 54) is **GRANTED**. Bandy-Freeman's claims are **DISMISSED WITH PREJUDICE**.

---

[7] *See, e.g.*, *Hope v. Pelzer*, 536 U.S. 730, 738, 741 (2002) ("As the facts are alleged by [the plaintiff], the Eighth Amendment violation is obvious. . . . [T]he salient question . . . is whether the state of the law [at the time of the challenged conduct] gave [the defendants] fair warning that their alleged treatment of [the plaintiff] was unconstitutional.").

Separately, the court will enter final judgment.

**DONE** and **ORDERED** this September 24, 2025.

_____
**NICHOLAS A. DANELLA**
UNITED STATES MAGISTRATE JUDGE